1
2
3
4
5
6

**DIANA L. COURTEAU (SBN 113442)**
**NEIL M. KATSUYAMA (SBN 273172)**
**COURTEAU & ASSOCIATES**
**dianacourteau@msn.com**
**880 Apollo Street, Suite 246**
**El Segundo, CA 60245**
**Telephone: (310) 647-2844**
**Facsimile: (310) 647-2842**

7
8

Attorneys for Respondent
JERRY JAMGOTCHIAN

9

10

UNITED STATES DISTRICT COURT

11

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| LINLEY INVESTMENTS, an Isle of Man Limited Company; ORPENDALE, Incorporated in the Republic of Ireland; LYNCH BAGES LIMITED, Incorporated in the Republic of Ireland; WYNATT, Incorporated in the Republic of Ireland; CHELSTON (IRELAND), Incorporated in the Republic of Ireland; and SPRINGCON, Incorporated in the republic of Ireland,   )<br><br>Petitioners,   )<br><br>v.   )<br><br>JERRY JAMGOTCHIAN, an individual,   )<br><br>Respondent.   )<br>_____   ) | CASE NO.: **CV 11-00724-JAK (RZx)**<br><br>**RESPONDENT JERRY JAMGOTCHIAN'S PRELIMINARY RESPONSE, INITIAL OUTLINE OF AFFIRMATIVE DEFENSES AND REQUEST FOR LIMITED NECESSARY DISCOVERY**<br><br>[FILED CONCURRENTLY WITH [PROPOSED] ORDER]<br><br>Date: September 8, 2011<br>Time: 9:30 a.m.<br>Judge: Hon. John A. Kronstadt<br>Courtroom: Roybal, 750 |

RESPONDENT'S PRELIMINARY RESPONSE, INITIAL OUTLINE OF AFFIRMATIVE
DEFENSES AND REQUEST FOR LIMITED NECESSARY DISCOVERY

1
2

## <u>TABLE OF CONTENTS</u>

3
4
5
6
7
8
9
10

I. <u>THE ARBITRATION AWARD CANNOT BE CONFIRMED AS PETITIONERS FAILED TO 1) PROVIDE NOTICE OF EITHER ALLEGED ARBITRATION; 2) PROVIDE NOTICE REGARDING SELECTION OF THE ARBITRATOR; 3) PROVIDE NOTICE OF EITHER ALLEGED ARBITRATION DATE, TIME, LOCATION, OF ANY HEARINGS; 4) DELIBERATELY IGNORED THE NOMINATION AGREEMENTS REGARDING SELECTION OF THE ARBITRATOR; AND 5) THE ARBITRATOR WAS BIASED AND HAD CONTINUING FINANCIAL RELATIONSHIPS WITH PETITIONERS LINLEY INVESTMENTS (DBA COOLMORE STUD)</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

II. <u>OVERVIEW OF AFFIRMATIVE DEFENSES</u>. . . . . . . . . . . . . . . . . . . . . . . . 3
    A. PETITIONERS KNOWINGLY CONSPIRED WITH VARIOUS PARTIES TO DEPRIVE JAMGOTCHIAN OF ANY ARBITRATION NOTICE, OF THE APPOINTMENT OF THE ARBITRATOR, OF THE ARBITRATION DATE AND OF ANY ACTUAL ARBITRATION HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B. NO ACTUAL ARBITRATION HEARING WAS EVER HELD AND THE ARBITRATOR DECIDED THE ENTIRE CASE BASED UPON DOCUMENTS SUBMITTED EXCLUSIVELY BY PETITIONERS, WHOLLY DEPRIVING RESPONDENT FROM SUBMITTING EVIDENCE, WITNESSES, AND THE ABILITY TO CROSS-EXAMINE TESTIMONY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    C. THE ARBITRATOR WAS SELECTED IN A MANNER THAT DIRECTLY CONFLICTS WITH THE PROCEDURES SET FORTH IN THE NOMINATION AGREEMENTS. . . . . . . . . . . . . . . . . . . . . . . . 12
    D. THE ARBITRATOR, AND THE TBA THAT SELECTED HIM, WERE HEAVILY BIASED AS THEY HAD A CONTINUING FINANCIAL AND BUSINESS RELATIONSHIP WITH COOLMORE, AND ENFORCING SUCH BIASED AWARDS WOULD BE AGAINST PUBLIC POLICY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    E. THE AWARD IS NOT FINAL AS JAMGOTCHIAN PLANS TO PETITION THE COURTS IN THE UNITED KINGDOM TO EXTEND THE TIME FOR JAMGOTCHIAN TO CHALLENGE THE ALLEGED

28

ARBITRATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

F. AS A WHOLE, ALL OF THE "ARBITRATION AWARDS" SMACK OF FRAUD AND UNCONSCIONABILITY WITH NO NOTICE, PARTICULARLY OF THE ALLEGED ARBITRATION DATES AND ABSOLUTELY NO HEARING, AN ARBITRATOR WHO IS CLEARLY INEXPERIENCED AND BIASED AND FAILED TO DISCLOSE THAT HE DOES BUSINESS WITH PETITIONERS, AND A CLEAR ABSENCE OF DUE PROCESS, ALL IN VIOLATION OF THE NEW YORK CONVENTION . . . . . . . . . . . . . . . . . . . . . . . . . 19

III. DISCOVERY THAT JAMGOTCHIAN REQUIRES IN SUPPORT OF HIS AFFIRMATIVE DEFENSES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

A. ABSENCE OF NOTICE AND A HEARING. . . . . . . . . . . . . . . . . . . 21

B. SELECTION AND EXPERIENCE OF THE ARBITRATOR. . . . . . . . 22

C. BIAS OF SHEPPARD AND THE ENGLISH TBA. . . . . . . . . . . . . . . 22

D. PROPER PARTIES AND OWNERSHIP OF THE STALLIONS. . . . . 23

E. THE DISCOVERY REQUESTED IS DIRECTLY RELEVANT TO JAMGOTCHIAN'S AFFIRMATIVE DEFENSES AND JAMGOTCHIAN WILL BE PREJUDICED WITHOUT SUCH INFORMATION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VI. JAMGOTCHIAN WILL NEED AT LEAST SIX MONTHS TO COMPLETE ALL NECESSARY DISCOVERY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

A. WRITTEN DISCOVERY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B. DEPOSITIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C. USE OF COMPUTER EXPERTS: E-MAILS OF SHEPPARD, BREEN AND JAMGOTCHIAN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

1

## <u>TABLE OF AUTHORITIES</u>

2

3

### FEDERAL CASES

4

<u>Brandeis Instel Ltd. v. Calabrian Chemicals Corp.</u>

5
      656 F.Supp. 160 (S.D.N.Y. 1987)......................................................15

6

<u>Commonwealth Coatings Corp. v. Continental Casualty Co.</u>

7
      393 U.S. 145 (1968).........................................................................15

8

<u>Encylopedia Universalis v. Encyclopedia Britannica, Inc.</u>

9
      403 F.3d 85 (2d Cir. 2005)...............................................................13

10

<u>Generica Limited v. Pharmaceutical Basics, Inc.</u>

11
      125 F. 3d 1123 (7th Cir. 1997)..........................................................4

12

<u>Hoeft v. MVL Group, Inc.,</u>

13
      343 F.3d 57 (2d Cir. 2003)...............................................................26

14

<u>Hoteles Condado Beach v. Union De Tronquistas Local 901,</u>

15
      763 F.2d 34 (1st Cir. 1985)..............................................................11

16

<u>Iran Aircraft Industries v. Avco Corp.</u>

17
      980F.2d 141 (2d Cir. 1992)...........................................................4, 10

18

<u>Matthews v. Eldridge,</u>

19
      424 U.S. 319 (1975).........................................................................10

20

<u>Mullane v. Central Hanover Bank & Trust Co.</u>

21
      339 U.S. 306 (1950)...........................................................................5

22

<u>Parsons & Whittemore Overseas, Inc. v. Societe General De L'Industrie du Papier</u>

23
      508 F.2d 969 (2d Cir. 1974)..............................................................4

24

<u>Qingdao Free Trade Zone Genius Int'l Trading Co. v. P&S Int'l Co.</u>

25
      No. 08-1292-HU (D. Or. 2009).......................................................4, 5

26

27

28

---

PRELIMINARY OPPOSITION AND REQUEST FOR LIMITED NECESSARY
DISCOVERY

iv

<u>Sesotris, S.A.E. v. Transportes Navales, S.A.</u>
    727 F.Supp. 737 (D. Mass. 1989)...................................................................10

<u>Sunshine Mining Co. v. United Steelworkers of America,</u>
    823 F.2d 1289 (9th Cir. 1987)..........................................................................11

<u>Transmarine Seaways Corp. v. Rich</u>
    480 F.Supp. 352 (S.D.N.Y. 1979) ................................................................15

<u>Woods v. Saturn Dist. Corp.,</u>
    78 F.3d 424 (9th Cir. 1996) ..........................................................................25

<u>Zeiler v. Deitsch</u>
    500 F.3d 157 (2d Cir. 2000)..........................................................................13

## TREATIES AND FEDERAL STATUTES

New York Convention, June 10, 1958, 330 U.N.T.S. 38, Article V ........................2

9 U.S.C. §201 *et seq.* ................................................................................2

Federal Rule of Civil Procedure 4(e)..........................................................6

**TO ALL PARTIES HEREIN AND TO THEIR ATTORNEYS OF RECORD:** Respondent Jerry Jamgotchian ("Jamgotchian") submits the following Preliminary Response and Request for Limited Necessary Discovery.

## I.
### THE ARBITRATION AWARD CANNOT BE CONFIRMED AS PETITIONERS FAILED TO 1) PROVIDE NOTICE OF EITHER ALLEGED ARBITRATION; 2) PROVIDE NOTICE REGARDING SELECTION OF THE ARBITRATOR; 3) PROVIDE NOTICE OF EITHER ALLEGED ARBITRATION DATE, TIME, LOCATION, OF ANY HEARINGS; 4) DELIBERATELY IGNORED THE NOMINATION AGREEMENTS REGARDING SELECTION OF THE ARBITRATOR; AND 5) THE ARBITRATOR WAS BIASED AND HAD CONTINUING FINANCIAL RELATIONSHIPS WITH PETITIONERS LINLEY INVESTMENTS (DBA COOLMORE STUD)[1]

Consistent with the Court's June 20, 2011 Order, Jamgotchian submits the following Preliminary Response which outlines some of the currently known affirmative defenses available to Jamgotchian and the discovery he requires to fully articulate those and other currently unknown defenses.[2] Unlike most proceedings to confirm an arbitral award, Jamgotchian was never notified or involved in the selection of the arbitrator, Jamgotchian was never provided with the date, time and location of the arbitration and was never provided with an arbitration hearing. As such, Jamgotchian has had limited access to information regarding the two alleged arbitrations and, due to these unique circumstances,

---

[1] Respondent still disputes that Linley Investments does business as Coolmore Stud as PETITIONERS have yet to submit any evidence indicating that this is true.

[2] *See* June 20, 2011 Transcript, Pg. 17.

requires significant discovery in order to fully avail himself of the affirmative

defenses that are applicable to this case.

Article V of the Convention for the Enforcement of Arbitral Awards ("the

New York Convention") sets forth seven affirmative defenses to the recognition of

a foreign arbitral award. 330 U.N.T.S. 3; codified in 9 U.S.C. §201 *et seq.* Based

upon the information presently available to Jamgtochian, at least three of those

affirmative defenses are applicable here. It has consistently been Jamgotchian's

position that the award cannot be recognized under Article V(1)(b) because he did

not receive any notice of either alleged arbitration, of the selection of the

arbitrator, or notice of the arbitration date, time or location for any arbitration

hearing. Further, no arbitration hearing was ever held, and this denied

Jamgotchian any opportunity to present his case. Article V(1)(d) is also applicable

as the arbitrator, Samuel Sheppard ("Sheppard"), was selected in a manner that is

inconsistent with the procedure set forth in the Nomination Agreements. The

parties never agreed that the Thoroughbred Breeders' Association (TBA) <u>in</u>

<u>England</u> would choose the arbitrator.[3] Lastly, Article V(2)(b) applies as both the

TBA of England and Sheppard both had and still maintain a long and continuing

financial relationship with Coolmore Stud ("Coolmore"). Enforcement of an award

where the arbitrator (as well as TBA-England who selected him) were plainly

biased is against public policy and is grounds for denying recognition of the

---

[3] The Court will recall that the previous motion Jamgotchian filed was a Rule 12(b) Motion to Dismiss. The purpose of that Motion was to challenge the adequacy of the Petition, and as specifically stated in the Motion, it was not intended as a comprehensive analysis of all affirmative defenses available to Jamgotchian. As such, the affirmative defenses were only briefly addressed in the Motion to Dismiss and the granting of discovery will provide Jamgotchian to further develop these and other defenses.

PRELIMINARY OPPOSITION AND REQUEST FOR LIMITED NECESSARY
DISCOVERY

awards. As described in further detail below, Jamgotchian requires discovery related to each of these and other known and unknown affirmative defenses.

## II.
## OVERVIEW OF AFFIRMATIVE DEFENSES

The following is a preliminary overview of some of the affirmative defenses Jamgotchian anticipates he will raise upon completion of discovery. Based upon the currently available evidence, the awards cannot be recognized as Jamgotchian was never provided with proper notice of either arbitration, was not allowed to participate in the selection of the arbitrator and was never notified of the arbitration date, time or location of either alleged arbitration hearing. As the record shows, no arbitration was ever held, thereby depriving Jamgotchian of an opportunity to state his case. Lastly, the arbitrator was selected in clear violation of the Nomination Agreements, while the TBA of England and the arbitrator both had a direct financial relationship with all of the PETITIONERS and Coolmore.

**A.  PETITIONERS KNOWINGLY CONSPIRED WITH VARIOUS PARTIES TO DEPRIVE JAMGOTCHIAN OF ANY ARBITRATION NOTICE, OF THE APPOINTMENT OF THE ARBITRATOR, OF THE ARBITRATION DATE AND OF ANY ACTUAL ARBITRATION HEARING**

PETITIONERS failed to meet even the minimum standard for procedural due process as the arbitration was conducted without a noticed hearing and without any notice to Jamgotchian regarding the date, time or location of the alleged arbitration hearing and without the right to participate in the selection of the arbitrator.

Article V(1)(b) of the New York Convention states that an award cannot be confirmed if: "The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case." This provision has been interpreted by U.S. courts to mean that the arbitration must comply with U.S. standards of procedural due process. Parsons & Whittemore Overseas, Inc. v. Societe General De L'Industrie du Papier, 508 F.2d 969, 975 (2d Cir. 1974) ("This provision essentially sanctions the application of the forum state's standards of due process."); Generica Limited v. Pharmaceutical Basics, Inc., 125 F.3d 1123, 1129-30 (7th Cir. 1997) ("An arbitral award should be denied or vacated if the party challenging the award proves that he was not given a meaningful opportunity to be heard *as our due process jurisprudence* defines it." (emphasis added)).

Therefore, an arbitration award cannot be confirmed unless the arbitration meets the two most fundamental elements of due process under U.S. law, that a hearing was held, and notice was given. Iran Aircraft Industries v. Avco Corp., 980 F.2d 141, 146 (2d Cir. 1992) (holding that U.S. due process standards for a hearing apply to a petition to confirm an arbitration award); Qingdao Free Trade Zone Genius Int'l Trading Co. v. P&S Int'l Co., No. 08-1292-HU (D. Or. 2009) (applying U.S. due process notice standards to a New York Convention case). Because Jamgotchian did not receive notice of either alleged arbitration hearing, never participated in the appointment of the arbitrator, never received notice of either of arbitration date, and because there was never an actual arbitration hearing held, the awards cannot be lawfully confirmed.

## I. PETITIONERS DENIED JAMGOTCHIAN HIS PROCEDURAL DUE PROCESS RIGHTS AS THEY DID NOT GIVE

**JAMGOTCHIAN PROPER NOTICE OF THE DEMAND FOR ARBITRATION**

Seeing as how Sheppard failed to conduct any arbitration hearing, it would have been impossible for Jamgotchian to receive adequate notice of a hearing that never occurred. But assuming, *arguendo*, that Sheppard's ruling on Coolmore's papers constitutes an adequate hearing, Jamgotchian still did not receive notice of these "proceedings." Notice "must be reasonably calculated, under all circumstances, to apprise interested persons of the pendency of the action and afford them an opportunity to present their objections." <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 314 (1950); <u>Qingdao Free Trade Zone Genius Int'l Trading Co. v. P&S Int'l Co.</u>, No. 08-1292-HU (D. Or. 2009) (applying the <u>Mullane</u> standard to an Article V(1)(b) challenge).

The earliest letter that PETITIONERS allegedly sent Jamgotchian informing him that arbitration would commence was a letter dated February 26, 2010, allegedly sent by mail and e-mail, in which PETITIONERS proposed three arbitrators and asked if Jamgotchian would agree to any of them. Decl. of Breen in Support of Opposition to Motion to Dismiss, Exhibits D1-D14. Jamgotchian never received this February 26, 2010 letter.

This is the first of a few letters PETITIONERS allegedly sent to Jamgotchian sometimes either by mail, fax, or e-mail, but which Jamgotchian did not receive. In fact, PETITIONERS have provided no actual evidence that Jamgotchian actually received any of these letters, that he ever responded to any of these letters, and at no time was Jamgotchian ever contacted by telephone or by personal service. Jamgotchian's fax machine was not attached to a dedicated line and had to be manually engaged because this line also serves as his home

telephone and computer access line. *See* Decl. of Jamgotchian, ¶3. Regarding his e-mail, Jamgotchian's computer has an aggressive spam filter, as well as multiple e-mail accounts, which automatically block unknown and foreign e-mails. *See* Decl. of Jamgotchian, ¶4. As for the P.O. Box address, Jamgotchian is away for extended periods of time and accepts his mail at his home office address. He does not frequently visit his P.O. Box as that is done by others. *See* Decl. of Jamgotchian, ¶2. As PETITIONERS are aware, Jamgotchian travels both domestically and internationally to develop and manage his various real estate holdings as well as to purchase and sell horses, enter into nomination and other agreements, and oversee the racing and training of his horses. Id. Jamgotchian never received the February 26, 2010 letter.

It is also notable that PETITIONERS did not choose any of the methods set forth in the Federal Rules of Civil Procedure to serve notice of the arbitration, yet complied with the Rules when serving the Petition. While Federal Rule of Civil Procedure 4(e) does not govern arbitration proceedings, it sets forth three methods of notice that are deemed sufficient for the purposes of due process. These include: 1) personal delivery; 2) substitute service; and 3) delivery to an appointed agent. None of these options were chosen by PETITIONERS, who claim they only used regular mail, fax, and e-mail. It is also noteworthy that, conveniently, PETITIONERS were aware of Jamgotchian's home address and telephone number and used personal service when serving the Petition; yet failed to do so when serving any of the alleged arbitration related notices or documents.

**ii. PETITIONERS NEVER GAVE ANY NOTICE OF THE SELECTION OF THE ARBITRATOR AS THE NEW YORK**

---

**CONVENTION REQUIRES, PRECLUDING CONFIRMATION OF THE AWARDS**

Under Article V(1)(b), PETITIONERS were required to provide notice to Jamgotchian of the appointment of the arbitrator, but completely failed to and thereby foreclosed Jamgotchian from being able to challenge the selection. As described above, PETITIONERS, through their attorney William Fry, claim they sent a letter, dated February 26, 2010, in which PETITIONERS proposed three arbitrators and asked if Jamgotchian would agree to any of them.[4] *See* Decl. of Breen in Support of Opposition to Motion to Dismiss, Exhibits D1-D14. Notably, Sheppard was not on this list; therefore this letter could not have given Jamgotchian notice of the appointment of Sheppard and at no time was Jamgotchian ever provided with notice regarding the appointment of Sheppard or his unilateral appointment by the English TBA, in clear violation of the Nomination Agreement.

PETITIONERS (based on their own statements) then sent several letters to the English Thoroughbred Breeders Association ("TBA") requesting that it select an arbitrator; none of which were ever provided to Jamgotchian. *See* Decl. of Breen, Exhibits H and I. After Sheppard was selected, neither PETITIONERS nor the TBA ever contacted or sent any correspondence to Jamgotchian regarding the appointment of Sheppard.

---

[4] As discussed in further detail below, the Nomination Agreements require the parties to attempt to agree upon an arbitrator, and that the TBA will select an arbitrator only if the parties do not come to an agreement within 28 days. In this case, it is without dispute that Jamgotchian and PETITIONERS never came to any agreement relating to the selection of an arbitrator, and that Jamgotchian was never conferred with, or ever received any notice about the appointment of Sheppard, as required in the Nomination Agreement.

The first time Jamgotchian could have potentially had notice of Sheppard's appointment was a June 7, 2010 letter (which Jamgotchian never received), purportedly sent by regular mail, from Sheppard. *See* Decl. of Sheppard in Support of Opposition to Motion to Dismiss, Exhibit 1. In that letter, Sheppard asked if Jamgotchian had any defenses he wished to raise, and wrote that "If you do not respond...I shall conclude that you do not intend to participate in the process and shall make such award as I see fit **without prior notice to you**." (emphasis added). From the very first letter, Sheppard had already expressed his disdain, bias and willingness to rule against Jamgotchian; **without providing notice or establishing any arbitration rules, discovery opportunity or normal arbitrator procedures**.

Further evidence of Sheppard's predisposition to rule against Jamgotchian can be seen in his July 21, 2010 letter in which **he has already drafted awards**, which Jamgotchian believes were actually drafted by PETITIONERS' counsel Breen. Sheppard, having allegedly sent a single letter by regular mail, and without even scheduling a hearing or contacting Jamgotchian by telephone or through personal service, had already written his decision; as drafted by Breen. *See* Decl. of Sheppard in Support of Opposition to Motion to Dismiss, Exhibit 3. Sheppard alleges that he sent this letter by regular mail, e-mail, and fax, but Jamgotchian did not receive this letter either. Lastly, Sheppard allegedly sent an e-mail and fax on August 16, stating that he was about to issue his final awards; again providing evidence that Sheppard was ruling without having heard Jamgotchian's version of the events or making any attempt to contact by Jamgotchian by telephone or personal service. *See* Decl. of Sheppard in Support of Opposition to Motion to Dismiss, Exhibit 5.

PRELIMINARY OPPOSITION AND REQUEST FOR LIMITED NECESSARY DISCOVERY

As the evidence shows, none of these messages were received by Jamgotchian before Sheppard issued his final decisions on August 23, 2010 and September 1, 2010; for the reasons stated above. Even if they were sent, (for which PETITIONERS have provided no reasonably acceptable evidence, such as a signature by Jamgotchian or proof of personal service), these letters were not received because Jamgotchian's e-mail and fax are unreliable, and because Jamgotchian frequently does not pickup mail at his P.O. Box for long periods of time. *See* Decl. of Jamgotchian, ¶¶ 6-8. Given Sheppard's own letter stating that he was willing to issue awards without holding a hearing and **without prior notice**, it is not surprising that Sheppard and PETITIONERS chose to allegedly use unreliable e-mail, fax, and regular mail instead of any of the more reliable methods of service as set forth in the Federal Rules of Civil Procedure.

### iii. PETITIONERS FAILED TO MEET THE STANDARDS OF DUE PROCESS BY NOT PROVIDING JAMGOTCHIAN WITH NOTICE OF AN ARBITRATION DATE

None of these letters ever stated that the arbitration would be conducted on a specific date, time, or location. Rather, Sheppard allegedly sent two letters with his tentative decision. Therefore, Jamgotchian was never provided notice of the date, time, or location of either of the alleged arbitrations.

This Court is all too familiar with arbitration procedure requiring a date certain and ample notice of the arbitration, which permits the parties to obtain documentary evidence, witnesses, and to arrange their schedules so that they may be present for the hearing. Having a properly noticed arbitration date permits the parties to be prepared and present their case to the arbitrator. All normal bounds of

due process and procedure were circumvented here and this circumvention scheme was crafted by both Sheppard and Breen, as further outlined herein.

**iv. PETITIONERS PURPORTEDLY USED UNACCEPTABLE METHODS FOR SERVICE, FAILED TO PROVIDE JAMGOTCHIAN WITH NOTICE OF THE ARBITRATION, OF THE SELECTION OF THE ARBITRATOR, AND FAILED TO NOTICE AN ARBITRATION DATE**

In short, Jamgotchian was never properly notified of the arbitration, never knew or participated in the selection of Sheppard, and was never provided notice of either alleged arbitration date. Notice of Sheppard's awards sent many months after the fact falls far below the standards required of Due Process, and is grounds for a refusal to recognize the arbitration awards. Sesostris, S.A.E. v. Transportes Navales, S.A., 727 F.Supp. 737, 743 (D. Mass. 1989).

**B. NO ACTUAL ARBITRATION HEARING WAS EVER HELD AND THE ARBITRATOR DECIDED THE ENTIRE CASE BASED UPON DOCUMENTS SUBMITTED EXCLUSIVELY BY PETITIONERS, WHOLLY DEPRIVING RESPONDENT FROM SUBMITTING EVIDENCE, WITNESSES, AND THE ABILITY TO CROSS-EXAMINE TESTIMONY**

Completely absent from the Petition or any documents filed by PETITIONERS is a statement that an actual hearing was held. As stated above, Article V(1)(b) has been interpreted to mean that the arbitration must comply with U.S. standards of procedural due process. The "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Iran Aircraft Industries v. Avco Corp., 980 F.2d 141, 146 (2d Cir. 1992); Matthews v. Eldridge, 424 U.S. 319, 333 (1975) ("This Court consistently has

held that some form of hearing is required before an individual is finally deprived of a property interest"). A fundamentally fair hearing requires that the arbitrator must, "give each of the parties to the dispute an adequate opportunity to present its evidence and arguments." <u>Sunshine Mining Co. v. United Steelworkers of America</u>, 823 F.2d 1289, 1295 (9th Cir. 1987); <u>Hoteles Condado Beach v. Union De Tronquistas Local 901</u>, 763 F.2d 34, 39 (1st Cir. 1985).

Here, Jamgotchian is being held liable for €280,000 (approximately $400,000)[5] without ever having had a chance to present his case at a hearing as both PETITIONERS and Sheppard conspired to deliberately circumvent Jamgotchian's due process rights. The Petition only refers to "an ad-hoc arbitration" but makes **no mention of any actual hearing**. In fact, Sheppard's written decisions of August 23, 2010 and September 1, 2010 specifically list the evidence he relied upon, and those decisions state that the **only** evidence he considered are letters, documents, and communications with PETITIONERS' attorney, William Fry. *See* Decl. of Sheppard in Support of Petition, Exhibits A-1 through N-1, ¶¶ 9-11 (which **never** states that a hearing was ever held or that Sheppard considered or verified any evidence or oral testimony, and Sheppard's decisions were clearly written for the purpose of enforcement after the fact, and not to permit Respondent to participate.)[6]

Sheppard also issued supplemental awards on September 3, 2010, but these simply corrected his previous award listing Linley Investments as based in Ireland

---

[5] Assuming an exchange rate of $1.44 per €1, the average rate for July, 2011.

[6] Respondent implores the Court examine Sheppard's decisions and see firsthand that there is no reference to any arbitration hearing or notice of a date, time, and location for the alleged arbitration. The one-sidedness of using awards prepared by PETITIONERS' legal counsel further shows that this was not a lawful or unbiased arbitration.

instead of the Isle of Man. *See* Decl. of Sheppard in Support of Petition, Exhibits A-2 through N-2. But again, these supplemental awards make no mention of **any** hearing, and specifically state that Sheppard's correction is based only on his correspondence with PETITIONERS' attorney William Fry.  *See* Decl. of Sheppard in Support of Petition, Exhibits A-2 through N-2, ¶4. Therefore, in all of Sheppard's August 23 and September 3 written decisions, there is never any reference to a hearing because no arbitration was ever held by Sheppard.

Based upon PETITIONERS' own documents, **no hearing was ever held**. Sheppard's decisions based upon evidence exclusively from PETITIONERS are one-sided and in no way resemble a fundamentally fair hearing, as due process requires. Such a proceeding falls far below the requirements of fundamental fairness, as Jamgotchian was completely denied any opportunity to present any evidence, make any arguments, or cross-examine any testimony submitted by PETITIONERS. In short, Jamgotchian was not permitted to set forth his own arguments or challenge any of PETITIONERS' evidence and Sheppard's "proceeding" was fundamentally unfair. Sheppard's ad-hoc procedures thereby denied Jamgotchian of his due process right to be heard as well as his right to be present, and to cross-examine testimony. *See* Decl. of Jamgotchian, ¶¶ 9 and 10. With no hearing, arbitration rules, or fundamental fairness, this Court cannot confirm Sheppard's awards under the New York Convention.

## C. THE ARBITRATOR WAS SELECTED IN A MANNER THAT DIRECTLY CONFLICTS WITH THE PROCEDURES SET FORTH IN THE NOMINATION AGREEMENTS

The New York Convention also requires that the arbitrator be selected in a manner consistent with the contract between the parties. Here, PETITIONERS

PRELIMINARY OPPOSITION AND REQUEST FOR LIMITED NECESSARY DISCOVERY

delegated selection of the arbitrator to the TBA of England, which was never agreed upon by the parties.

Under Article V(1)(d) a court may refuse to recognize an arbitration award where, "The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place." This affirmative defense focuses on the procedures in the contract for selecting the arbitrator. Zeiler v. Deitsch, 500 F.3d 157, 166 (2d Cir. 2000) ("The authority of the arbitrator is essentially an issue of contract interpretation, grounded in the language of the agreement between the parties."); See Encyclopedia Universalis v. Encyclopedia Britannica, Inc., 403 F.3d 85, 90-91 (2d Cir. 2005).

Here, the Nomination Agreements set forth a two-step process to selecting an arbitrator. First, the Contracts require  "a single arbitrator to be agreed upon between the parties." See Petition, Exhibits A-N at ¶14. If the parties cannot agree to an arbitrator within 28 days,  "either party can request the Council of the Thoroughbred Breeders Association to pick an arbitrator." Id. However, nearly every country and almost every U.S. state has a "Thoroughbred Breeder's Association." The Nomination Agreements do not specify which Association is being referred to.

PETITIONERS have bent both of these provisions according to their own convenience. PETITIONERS allegedly attempted to negotiate an arbitrator by sending the February 26, 2010 letter to Jamgotchian. But as discussed above, this letter was never received by Jamgotchian and it is inaccurate to state that the parties could not agree. Rather, one party was simply not notified that the purported arbitration (with no hearing) was being commenced.

PRELIMINARY OPPOSITION AND REQUEST FOR LIMITED NECESSARY DISCOVERY

13

Assuming that PETITIONERS had made a good faith attempt to negotiate the selection of an arbitrator for 28 days, PETITIONERS imposed their own interpretation regarding "which" Council of the Thoroughbred Breeder's Association (TBA) may select an arbitrator. PETITIONERS submitted a request to the English TBA, even though none of the parties are based in England, the Contracts were never executed in England, and none of the horses were in England. *See* Decl. of Breen, Exhibits H and I. Seeing as how Coolmore is based in both the United States and Ireland while Jamgotchian resides in the United States, the logical and only interpretation would have been to use a TBA in the United States because there is no TBA in Ireland.

At no time did Jamgotchian have any reason to believe that TBA would refer to the TBA in England. *See* Decl. of Jamgotchian, ¶ 13. In short, England had no venue in this transaction, and PETITIONERS' use of the English TBA was never intended by the parties, and therefore the composition of the arbitral authority was not in accordance with the Nomination Agreements.

Because PETITIONERS did not actually negotiate with Jamgotchian, and because PETITIONERS went to a TBA in a country that was completely unrelated to the Contracts or the Parties, the selection of the arbitrator was conducted in a manner inconsistent with the procedures set forth in the Contracts.

**D. THE ARBITRATOR, AND THE TBA THAT SELECTED HIM, WERE HEAVILY BIASED AS THEY HAD A CONTINUING FINANCIAL AND BUSINESS RELATIONSHIP WITH COOLMORE, AND ENFORCING SUCH BIASED AWARDS WOULD BE AGAINST PUBLIC POLICY[7]**

---

[7] As further information becomes available to Respondent, he reserves the right to amend this brief.

The Court may also decline to enforce an arbitration award where, as here, the arbitrator has a direct financial relationship with one of the parties.

Article V (2)(b) of the New York Convention states that enforcement may be refused where, "The recognition or enforcement of the award would be contrary to the public policy of that country." Courts have previously held that it would be against public policy to enforce an award made by a biased arbitrator as "The propriety and makeup of an arbitration panel sufficiently implicates public policy to fall within Article V (2)(b) of the Convention." Brandeis Instel Ltd. v. Calabrian Chemicals Corp., 656 F.Supp. 160, 169 (S.D.N.Y. 1987)

The relevant standard for assessing bias of an arbitrator is that "any tribunal permitted by law to try cases and controversies not only must be unbiased but must also avoid even the appearance of bias." Commonwealth Coatings Corp. v. Continental Casualty Co. 393 U.S. 145, 150 (1968). This standard has been applied to cases where an Article V(2)(b) defense has been raised. *See* Transmarine Seaways Corp. v. Rich, 480 F.Supp.352, 358 (S.D.N.Y. 1979) (The Supreme Court's elucidation of arbitral propriety in Commonwealth Coatings is a declaration of public policy.) A "direct financial or professional relationship between an arbitrator and a party" is sufficient to show bias. Brandeis Instel Ltd. v. Calabrian Chemicals Corp., 656 F.Supp. 160, 169 (S.D.N.Y. 1987).

**I. SHEPPARD HAS NO EXPERIENCE AS AN ARBITRATOR AND IS THE CHIEF EXECUTIVE OF AN ORGANIZATION THAT REGULARLY RECEIVES SIGNIFICANT FEES FROM COOLMORE**

In the present action, there is no evidence that the arbitrator Samuel

Sheppard has any experience as an arbitrator, but there is significant evidence that he had **repeated financial and professional dealings** with Coolmore Stud for over 20 years. As PETITIONERS have stated in their Opposition to the Motion to Dismiss, Coolmore Stud is actually the trade name for PETITIONERS. Therefore, Sheppard has been dealing directly with PETITIONERS for many years. *See* Opposition at ¶2.

Samuel Sheppard is the Chief Executive of an organization known as the European Breeders' Fund (EBF) which sponsors races using money raised from registering stallions.[8] *See* Decl. of Breen, Exhibit I (Sheppard is identified as "a senior executive of the European Breeders' Fund"); See Decl. of Jamgotchian ¶ 14. EBF Registered stallions are permitted to enter EBF sponsored races and are listed as "EBF Nominated" when advertised in catalogues. *See* Decl. of Jamgotchian ¶ 15.

The cost of EBF registration is equal to the "average value of nominations sold each year." As seen in the Nomination Agreements, the yearly cost to EBF nominate a stallion such as Coolmore's Holy Roman Emperor may be as high as £35,000 ($56,000). Therefore, registration for a single horse may cost over $50,000, and Coolmore registers all of its horses with the EBF. In fact, Coolmore has paid millions of pounds to the **EBF for registration of the very horses that are the subject of this action**: Holy Roman Emperor, Ad Valorem, Excellent Art, Oratorio, Rock of Gibraltar, Hurricane Run, and Dylan Thomas.

There can be no dispute that Sheppard, as head of the EBF, clearly has had a direct financial relationship with Coolmore for many years, a fact that was never

---

[8] It is notable that England's TBA and the EBF share the exact same business address.

PRELIMINARY OPPOSITION AND REQUEST FOR LIMITED NECESSARY DISCOVERY

16

disclosed to Jamgotchian. Further, Coolmore routinely nominates all of its yearling horses with the EBF as the EBF receives 70% of its nomination fees from Coolmore and Darley Stud Farm. *See* Decl. of Jamgotchian, ¶ 17. Coolmore's payments therefore constitute a substantial portion of the EBF's revenues.

Sheppard besides having no experience or knowledge to serve as an arbitrator, is clearly biased on two levels; his organization has registered all of Coolmore's stallions listed in this action, and Coolmore's fees make up a significant portion of the EBF's revenues. Sheppard, as head of the EBF, had a undisclosed and long-standing continuing financial relationship with Coolmore, and this arbitration (if it can be called that) was conducted by a biased and totally inexperienced arbitrator which Jamgotchian had no opportunity to disqualify or inquire about. Where an arbitrator has such obvious bias, and lacks any knowledge of arbitration rules or due process rights, it is against public policy to recognize his decision. Therefore, recognition of Sheppard's arbitration awards to Coolmore is against U.S. public policy and cannot be confirmed.

### ii. THE MAJORITY OF THE TRUSTEES OF THE TBA OF ENGLAND HAVE, AND CONTINUE TO HAVE, ROUTINE BUSINESS DEALINGS WITH COOLMORE

Not only does Sheppard have a clear business relationship with Coolmore, many members of the board of the English TBA also have deep business relationships with Coolmore as well. *See* Decl. of Jamgotchian at ¶ 19. It is undisputed that a majority of the TBA-England Board of Directors who appointed Sheppard have substantial business connections to Coolmore. **Kristen Rausing** is a major breeder that regularly buys horses from and sells horses to Coolmore. *See*

Decl. of Jamgotchian at ¶ 20. **Julian Wilson** is a close friend with Coolmore and one of its founders, Robert Sangster. *See* Decl. of Jamgotchian at ¶ 21. **Julian Dollar** routinely uses Coolmore trainers and buys horses from and sells horses to Coolmore. *See* Decl. of Jamgotchian at ¶ 22. **Grant Pritchard-Gordon** is a bloodstock agent who buys and sells Coolmore horses. *See* Decl. of Jamgotchian at ¶ 23. **Chris Wright**, buys and sells Coolmore horses. *See* Decl. of Jamgotchian at ¶ 24. **Julian Richmond-Watson**, close friend with Coolmore and its founder. *See* Decl. of Jamgotchian at ¶ 25. **Paul Greeves** is a former director of Weatherbys, a major horse breeder, that routinely does business with Coolmore. *See* Decl. of Jamgotchian at ¶ 26.

Taken together, the majority of English TBA's Board members' have a strong financial connection with Coolmore and Sheppard's business transactions with Coolmore through the EBF cast serious doubt as to the neutrality of the arbitration. Both the arbitrator (who lacks any experience to serve as an arbitrator), and the body that selected the inexperienced arbitrator, have significant businesses connections with Coolmore, and such bias is grounds for refusing to confirm the clearly biased arbitral awards.

**E. THE AWARD IS NOT FINAL AS JAMGOTCHIAN PLANS TO PETITION THE COURTS IN THE UNITED KINGDOM TO EXTEND THE TIME FOR JAMGOTCHIAN TO CHALLENGE THE ALLEGED ARBITRATION**

Jamgotchian is currently considering a petition to the United Kingdom court to extend his time to respond to PETITIONERS' so-called arbitration. Article V(1)(e) states that an award cannot be confirmed where, "the award has not yet

become binding on the parties, or has been set aside or suspended by a competent authority of the country, in which, or under the law of which, that award was made." Here, Jamgotchian's petition could extend his time to challenge the underlying arbitration, thereby giving him the hearing that he seeks, and rightfully deserves.

**F. AS A WHOLE, ALL OF THE "ARBITRATION AWARDS" SMACK OF FRAUD AND UNCONSCIONABILITY WITH NO NOTICE, PARTICULARLY OF THE ALLEGED ARBITRATION DATES AND ABSOLUTELY NO HEARING, AN ARBITRATOR WHO IS CLEARLY INEXPERIENCED AND  BIASED AND FAILED TO DISCLOSE THAT HE DOES BUSINESS WITH PETITIONERS, AND A CLEAR ABSENCE OF DUE PROCESS, ALL IN VIOLATION OF THE NEW YORK CONVENTION**

PETITIONERS repeatedly portray themselves as victims, when in fact they seek to confirm an award that was obtained during a so-called "arbitration" where Jamgotchian did not receive any notice as discussed herein. PETITIONERS and their inexperienced and biased arbitrator conspired together to eliminate any chance for Jamgotchian to present his case, a gross violation of the requirement of fundamental fairness required by due process.

Not only did PETITIONERS foreclose Jamgotchian from presenting his case, they submitted their case to Samuel Sheppard, an arbitrator with no arbitration experience and the person who regularly does business with PETITIONERS. In fact, Sheppard's EBF organization receives millions of pounds in registration fees for **the very same stallions** that are involved in this case. When viewed together with the repeated business dealings Coolmore has had with the English TBA, the entire "arbitration process" that PETITIONERS seek to

confirm is little more than an attempt to cast the veil of legitimacy on a judgment rendered by friends and associates of Coolmore. This is the reason why PETITIONERS conspired with their partner Sheppard to deliberately not provide notice to Jamgotchian and never held a fair hearing. Respondent is entitled to a fair arbitration under the New York Convention by an experienced and unbiased arbitrator. With no proper notice, absolutely no notice of either alleged arbitration hearing, and absolutely no actual arbitration hearing, the unconscionability of these tactics requires that this Court not confirm these awards under the New York Convention.

## III.
## DISCOVERY THAT JAMGOTCHIAN REQUIRES IN SUPPORT OF HIS AFFIRMATIVE DEFENSES

As explained above, Jamgotchian has limited information regarding either of the alleged arbitrations as PETITIONERS denied Jamgotchian the opportunity to be involved with selecting the arbitrator, choosing the governing law, or selecting the venue. Further, no hearing was ever held, making it impossible for Jamgotchian to witness any arguments made by PETITIONERS or cross-examine any testimony submitted by PETITIONERS to Sheppard. Without any opportunity to conduct discovery, Jamgotchian will be severely prejudiced as only PETITIONERS are familiar with the entire alleged arbitration while Jamgotchian is relying upon whatever pieces of information PETITIONERS have chose to provide him in their Declaration.

In order to fully set forth his affirmative defenses, Jamgotchian requires significant discovery from PETITIONERS relating to the any alleged notice of the

two arbitrations, of the selection of Sheppard as the arbitrator by the TBA-England, and of the two arbitrations allegedly held. Jamgotchian also needs information on whether any hearings were conducted and all documents evidencing Sheppard and the European Breeders' Fund's close financial relationship with Coolmore and the PETITIONERS.

## A. ABSENCE OF NOTICE AND A HEARING

### I. NOTICE

One of Jamgotchian's challenges to the confirmation of the awards is that Jamgotchian was never given notice of the two arbitrations, of the appointment of Sheppard or of the alleged arbitration dates. In support of this defense, Jamgotchian seeks the following: 1) any correspondence from Louise Kemble, Chief Executive of the English TBA, giving Jamgotchian notice of the appointment of Sheppard; 2) any correspondence from any member of the English TBA giving Jamgotchian notice of the appointment of Sheppard; 3) any correspondence from Coolmore's attorney and declarant Michael Meuser or Breen giving Jamgotchian notice of the appointment of Sheppard; and 4) any correspondence giving Jamgotchian notice of a date, time and location of the two alleged arbitrations.

### ii. HEARING

Based upon Sheppard's written decisions and the documents provided by PETITIONERS, there was no actual arbitration hearing ever held. The failure to hold an arbitration hearing would violate U.S. standards of Due Process and would be grounds for a defense under Article V(1)(b). Jamgotchian therefore seeks the

following: 1) any records or transcripts indicating that a hearing was held and if so, who was in attendance; 2) any letters, e-mails, or other correspondence to Jamgotchian notifying him of the specific date, time and place where the hearing was held; 3) any notice regarding the governing law Sheppard would use in his proceeding; 4) any independent investigations done by Sheppard and any opportunity Jamgotchian was given to challenge the findings of those investigations; 5) if no hearing was held, any documents setting forth exigent circumstances that made a hearing impracticable; and 6) any evidence showing that Sheppard is qualified to serve as an arbitrator and also is without bias or conflict.

**B. SELECTION AND EXPERIENCE OF THE ARBITRATOR**

Jamgotchian seeks information on how Sheppard was selected, and whether PETITIONERS have any evidence that the parties had agreed, orally or in writing, that the TBA of England would select the arbitrator. Jamgotchian requires: 1) any documents indicating that Jamgotchian had agreed to the use of the TBA of England; 2) any documents supplementing the Nomination Agreements that define which TBA is referred to in the Nomination Agreements; 3) any facts indicating that the Nomination Agreements or the parties had any connection with English law; 4) the identify of the TBA members and trustees who chose Sheppard; and 5) any documents indicating how Sheppard was selected or what criteria was used in choosing an arbitrator, without experience or knowledge of the rules of arbitration.

**C. BIAS OF SHEPPARD AND THE ENGLISH TBA**

Lastly, Jamgotchian seeks all information regarding Coolmore's repeated business transactions with Sheppard through the European Breeders' Fund. Given that every one of Coolmore's horses related to this action is registered with the EBF, Jamgotchian is entitled to know if the EBF was receiving payments from Coolmore at the time of the alleged arbitrations. Further, Jamgotchian is entitled to discover how much EBF received from Coolmore, as Jamgotchian has reason to believe that Coolmore pays a substantial amount of money in registration fees to the EBF.

In addition, Jamgotchian has reason to believe that the TBA which selected Sheppard has extensive ties to Coolmore. The bias of both Sheppard and the TBA Board members who selected Sheppard would be grounds for denying recognition of the arbitral awards under Article V(2)(b).

Jamgotchian therefore seeks: 1) the amount of fees and payments made by Coolmore to the EBF between 2000 and 2010; 2) any records regarding EBF fees paid by Coolmore for the registration of Holy Roman Emperor, Ad Valorem, Excellent Art, Oratorio, Rock of Gibraltar, Hurricane Run, and Dylan Thomas; 3) dates when Sheppard served as Chief Executive of the European Breeders' Fund; 4) any records relating to other fees and payments made by Coolmore to the EBF and 5) any and all business transactions between the English TBA board members and Coolmore.

## D. PROPER PARTIES AND OWNERSHIP OF THE STALLIONS

In light of the existing conflict between Sheppard and Coolmore, Jamgotchian is entitled to know if other conflicts of interest exist between the arbitrator and PETITIONERS. As such, Jamgotchian seeks information identifying

all individuals and entities associated with PETITIONERS, including: 1) the names of all officers of PETITIONERS; 2) the formation documents for all PETITIONERS; 3) copies of the syndicate agreements for each horse; and 4) all documents relating to any and all payments made from Jamgotchian to PETITIONERS, if any.

**E. THE DISCOVERY REQUESTED IS DIRECTLY RELEVANT TO JAMGOTCHIAN'S AFFIRMATIVE DEFENSES AND JAMGOTCHIAN WILL BE PREJUDICED WITHOUT SUCH INFORMATION**

Each of the topics discussed above directly relate to one of the three New York Convention affirmative defenses currently available to Jamgotchian. Depriving Jamgotchian of this discovery will be prejudicial as Jamgotchian has limited information about an arbitration that was organized, planned, and conducted without his participation. Therefore, Jamgotchian must be permitted to conduct discovery on the issues raised above.

**VI.**
**JAMGOTCHIAN WILL NEED AT LEAST SIX MONTHS TO COMPLETE ALL NECESSARY DISCOVERY**

If Jamgotchian is permitted to pursue this necessary discovery, Jamgotchian plans to immediately commence discovery in the following manner.

**A. WRITTEN DISCOVERY**

Some of the discovery Jamgotchian requires can be obtained through straightforward written discovery. Special interrogatories, requests for admission, and requests for production of documents should be adequate to obtain evidence

---

on issues such as whether any hearing was held and if so, how that hearing was conducted. Written discovery would also be effective in obtaining documentation of all business transactions between Coolmore, Sheppard, and the English TBA Board and staff members.

## B. DEPOSITIONS

Several topics are better suited for depositions, such as how the TBA Board selected Sheppard, and whether they were aware of his business relationship with Coolmore when making that selection. PETITIONERS have filed several letters between Louise Kemble, the Chief Executive of the English TBA, and Jamgotchian anticipates that she would be the person most knowledgeable on how Sheppard was chosen. Jamgotchian expects that he will need to depose Kemble as well as PETITIONERS regarding the extent of any business transactions between Coolmore and the English TBA Board members.

Jamgotchian also seeks the deposition of Sheppard himself, to determine his qualifications to serve as an arbitrator, any notice he allegedly provided to Jamgotchian, any bias he has and whether or not an actual arbitration hearing was ever held. Further, Sheppard's written decision provide a very limited description of precisely what evidence he reviewed and how PETITIONERS were permitted to present their arguments. All of this would provide invaluable testimony on whether Sheppard conducted the arbitration in a manner consistent with U.S. standards for Due Process. These questions would be in addition to Sheppard's discussion of his position with the EBF and the extent of his business relationship with Coolmore.

While an arbitrator generally may not be deposed, questioning of arbitrators is permitted where there is clear evidence of impropriety. <u>Woods v. Saturn Dist. Corp.</u>, 78 F.3d 424, 430 (9th Cir. 1996) (quoting <u>Andros Compania Maritima, S.A. v. Marc Rich & Co., 579 F.2d 691, 702 (2d Cir. 1978)</u>) When a non-prevailing party makes a clear showing of the arbitrator's fraud, misconduct, or bias may a district court properly grant that party's request to depose an arbitrator. <u>Hoeft v. MVL Group, Inc.</u>, 343 F.3d 57, 68 (2d Cir. 2003).

Here, Sheppard is the Chief Executive of the EBF, which routinely receives millions of pounds in fees as well as significant purse revenues from Coolmore. In addition, the EBF has registered all of the Coolmore horses involved in this action, providing further evidence of Sheppard's bias. This constitutes a direct financial relationship with Coolmore and is one of the grounds for permitting the deposition of an arbitrator. Jamgotchian therefore seeks the deposition of Sheppard so that he may explain how he can render a decision where he has such a clear financial relationship with PETITIONERS.

## C. USE OF COMPUTER EXPERTS: E-MAILS OF  SHEPPARD, BREEN AND JAMGOTCHIAN

Jamgotchian also requires expert testimony regarding whether Sheppard and Breen actually sent the alleged e-mails providing notice, and whether Jamgotchian's computer actually received these alleged e-mails. Jamgotchian therefore seeks a computer expert to testify regarding all communications that relate to or are associated with PETITIONERS' position against Jamgotchian, including: 1) all communications concerning notice of the selection of the arbitrator, the arbitration date, time and location, and any hearing; 2) all

communications between Sheppard, Breen, and others regarding Jamgotchian or the alleged arbitration proceedings.

## VII.
## UPON COMPLETION OF DISCOVERY, JAMGOTCHIAN WILL CONCLUSIVELY DEMONSTRATE THAT THE AWARDS ARE UNENFORCEABLE DUE TO THE ABSENCE OF NOTICE AND ANY HEARINGS, THE IMPROPER SELECTION OF THE ARBITRATOR, AND THE ARBITRATORS FINANCIAL DEALINGS WITH THE PETITIONERS AND COOLMORE

While Jamgotchian still requires additional documents from PETITIONERS, the documents PETITIONERS have already filed indicate that multiple defenses under Article V of the New York Convention are applicable. PETITIONERS did not provide any notice of time or the location of the alleged arbitrations, of the selection of the arbitrator, or of any arbitration dates. They also never held a hearing, thereby depriving Jamgotchian of any opportunity to present his case. Further, Sheppard was selected by the TBA of England, a body not authorized in any of the Nomination Agreements. It is also clear that Sheppard had a bias and was conflicted; not to mention the fact that he had no experience to serve as an arbitrator. PETITIONERS unilaterally requested the English TBA to make the selection of the arbitrator Sheppard because PETITIONERS were well aware of Sheppard's repeated business dealings between Coolmore and his bias in favor of Coolmore.

In light of the multiple, good faith, affirmative defenses available to Jamgotchian, he submits this Brief so that he may be permitted to obtain the necessary evidence to conclusively prove that the arbitration awards should not be recognized. Jamgotchian therefore respectfully requests that the Court: 1) permit

Jamgotchian at least 6 months to complete discovery; and 2) provide a Response to the Petition once discovery is complete; or 3) dismiss the Petition by finding that any or all of the above described affirmative defenses under the New York Convention are applicable.

DATED: July 26, 2011                    Respectfully submitted,
                                        COURTEAU & ASSOCIATES
                                        DIANA L. COURTEAU
                                        NEIL M. KATSUYAMA


                                        By _____
                                        DIANA L. COURTEAU
                                        /s/ NEIL M. KATSUYAMA
                                        Attorneys for Respondent
                                        JERRY JAMGOTCHIAN

---

PRELIMINARY OPPOSITION AND REQUEST FOR LIMITED NECESSARY DISCOVERY

28